Meurer Steel Barrel Company, Inc. v. Commissioner.
Meurer Steel Barrel Co. v. Commissioner
Docket No. 107763.
United States Tax Court
1943 Tax Ct. Memo LEXIS 421; 1 T.C.M. (CCH) 721; T.C.M. (RIA) 43113; March 4, 1943
*421 Benjamin Mahler, Esq., for the petitioner. Dean P. Kimball, Esq., and Jonas M. Smith, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency for 1937 of $80,217.45 income tax and $21,192.86 excess-profits tax. The issues are: (1) Whether the determination of deficiency was arbitrary; (2) whether a profit from the sale of assets is taxable to petitioner; (3) whether petitioner is entitled to a deduction of $9,500, legal and accounting expenses of dissolution and liquidation; (4) whether the aforesaid profits should be reduced by (a) $79,239.04, capital loss on sales of securities; (b) $36,925.45, additions to merchandise inventory; (c) $750.41, additions made to plant and equipment; (d) $1,628.28, operating expenses; (e) cost of goodwill; (5) the amount of dividends paid credit allowable, and (6) whether the deficiency is barred by the statute of limitations. Findings of Fact 1. The petitioner, a New York corporation, had its principal place of business in Newark, New Jersey. Its return for 1937 was filed in the Fifth District of New Jersey. Its accounts were kept on an accrual basis. The determination of deficiency *422 was not arbitrary. 2. On and prior to July 15, 1937, petitioner's shares were as follows: Com.
Pfd.
Meurer family
Andrew Meurer
0
15
Kenneth Meurer
75
200
Andrew Meurer, Jr.
0
200
Lillie M. Meurer
125
250
Grace M. Richards
0
1000
Ira Richards
100
0
Margaret C. Meurer
48
35
Mae F. Meurer
2585
1700
Anna M. Hopkins
0
1000
Young family
Roy S. Young
0
225
Mabel Y. Towner
0
175
Charles L. Jones
2000
0
W. W. Share (died May, 1937)
67
200
5000
5000 Jones had received the 2,000 common shares in 1935 for increasing the sale of barrels, and Fred S. Battershall had some interest in them. At the end of August, 1936, Jones, who was an executive of National Distillers and had been associated with Socony-Vacuum, told Emanuel A. Stern, who was general counsel for petitioner and managed the business affairs of Margaret C. Meurer and Mae F. Meurer, mother and daughter, that he was going out West, believed he could sell all petitioner's shares to a competitor, and would like to have an option on them. Stern conferred with the other shareholders. Negotiations thereafter continued between Stern and Jones and were consummated on January 12, 1937, with the *423 execution of an option agreement by all the shareholders of record and Battershall, as vendors, reciting that Jones, optionee, was "desirous of obtaining an option to acquire (directly or indirectly as * * * set forth), all the assets and goodwill of [petitioner], subject to all its liabilities, excepting the certain assets and liabilities * * * described as 'exclusions'". Under the agreement, Jones acquired the right to purchase the shares on or before ninety days from date, and to petitioner or the shareholders was reserved items of exclusion consisting in substance of all marketable securities owned by petitioner, subject to its liability to the Manufacturers Trust Company of New York upon notes for $36,000, and all recoveries in a patent infringement suit against the United States pending in the Court of Claims of the United States. The base price named was $70 a share of preferred and $30 a share of common, subject to certain variations for change in net assets between June 30, 1936, and the closing date. Upon the exercise of the option, the vendors would have the right to cause to be transferred to a new corporation all the assets and goodwill of the petitioner, excepting the *424 items of exclusion, and to retain their shares in petitioner, in which event the base price was to be $500,000. In order to exercise the option, it was necessary for the optionee or his assignee to deliver to vendors' counsel notice of election to exercise the option together with a certified check of $50,000 and an undertaking to pay the computed purchase price to the vendors at the time and place fixed for closing. On the same day, the shareholders agreed in writing to refrain from selling the shares during the life of the option, and appointed Margaret C. Meurer, Grace Richards, Andrew Meurer, Mae F. Meurer and Battershall as a sales committee with authority, inter alia, to extend the period of the option from time to time not exceeding six months, to execute sales agreements and to vote the shares at shareholders' meetings so as to effectuate the intention of the parties and the election of the committee "as to the method of carrying out said sale of assets of said company that may be required to be divested and to enable distribution of distributable interests by liquidating dividend, reduction of capital or otherwise". The money, property, securities and proceeds of recoveries *425 received by the sales committee for the account of the vendors, should be distributed $70 per share to holders of preferred and $30 per share to holders of common and all remaining sums available for distribution pro rata to preferred and common shareholders, subject to the right of preferred to receive and retain dividends if, as and when declared. In consideration of the option and expressed consent of the preferred shareholders to accept as a base price less than par, the common would not be entitled to participate in the recoveries in the pending suit of petitioner against the United States, but such recoveries should be distributed pro rata to preferred shareholders. On April 9, 1937, the sales committee extended the option from April 12, 1937 to July 12, 1937. In his discussion with some of the shareholders, Stern informed them that he would never recommend a sale by the corporation because of the "possible extraordinary tax that would have to be paid". On July 9, 1937, a special shareholders' meeting was held at the home of Margaret C. Meurer, the president. The president said that she believed it desirable for the petitioner to retire from its barrel business, *426 that she had conferred with Stern, and that he was about ready to submit a plan. The report of the president was approved and she was authorized to request Stern to submit his plan at a meeting on July 15. On July 9, 1937, attorneys representing Jones and an undisclosed prospective purchaser, told Stern that they wanted to work out a deal under the option, that they did not wish to carry out the purchase of the plant under a document such as the option and therefore requested a further extension of the option in order to negotiate the terms of a contract of sale. The sales committee extended the option to July 19, 1937. On July 15, 1937, Stern submitted to the shareholders his plan for complete liquidation and dissolution of petitioner, and it was approved. The plan included (1) a liquidating dividend in kind distributable July 17, 1937, subject to its liabilities; (2) collection and realization of accounts receivable and other remaining assets; (3) discharging all obligations of petitioner and assuming payment of some obligations by shareholders, and (4) distribution during January, 1938, of a further liquidating dividend of the net assets on hand January 1, 1938, final distribution *427 to be made on or before December 9, 1939. Resolutions were thereupon adopted to effectuate the plan. A first liquidating dividend was declared of all tangible property, as well as certain deferred charges and prepaid expenses and the goodwill, trade-name and other intangible assets located on or used in connection with the business, excepting cash on hand and in bank, marketable securities, accounts receivable, advances to officers and employees, judgment rendered July 6, 1937, against the United States in the patent infringement suit together with the proceeds, and all other claims of petitioner and proceeds thereof, subject to all liabilities incurred on or prior to July 17, 1937, excepting capital, surplus and profits, obligations of petitioner to Manufacturers Trust Company, federal and state taxes, and liability for any unpaid dividends. This resolution also provided: "that with respect to the dividend in kind so declared as the first step in liquidation, the same shall promptly be fairly valued with due heed paid to liabilities imposed upon and charged against the same and apportioned to and amongst the classes of stock outstanding, preferred and common, without regard to *428 the preferences previously authorized in the amended certificate of incorporation of this company and/or declared in the outstanding certificate of stock, but instead as follows, viz: (a) Said liquidating dividend, to the extent of the first $350,000 in value thereof so determined shall be apportioned, allotted and distributable to holders of preferred stock exclusively, pro rata according to their preferred stockholdings; (b) If the fair value of said first liquidating dividend so determined be in excess of $350,000, then said liquidating dividend to the extent of the excess in value thereof above $350,000, but not exceeding $500,000, shall be apportioned, allotted and distributable to holders of common stock exclusively. pro rata according to their common stockholdings, and (c) If the fair value of said first liquidating dividend so determined be in excess of $500,000, then said liquidating dividend to the extent of the excess in value thereof above $500,000 and in any event all subsequent liquidating dividends shall be apportioned, allotted and distributable to holders of preferred and common stock without distinction of class, pro rata according to their preferred *429 and common stockholdings A special liquidating dividend was declared of three-fourths of all recoveries from the United States upon the judgment of July 6, 1937, payable pro rata to preferred shareholders exclusively, the remaining one-fourth to be allocated to counsel. Directors Andrew Meurer, Mae F. Meurer, W. Lathrop Hopkins, Ira Richards and Margaret C. Meurer, were appointed liquidating trustees. A dividend of $3.50 per share was declared to preferred shareholders of record July 17, 1937, payable on or before December 31, 1937. All the shareholders were informed of the plan. On July 16, 1937, Mabel Young Towner, in order to consummate expeditiously the sale under the Jones option, transferred her 175 preferred shares to her brother, Roy S. Young. On July 17, 1937, Ira Richards, Andrew Meurer, Jr., Kenneth B. Meurer and Lillie Marie Meurer each authorized the petitioner to transfer his or her shares to Andrew Meurer, and Margaret C. Meurer authorized the transfer of her shares to her daughter, Mae F. Meurer. Andrew Meurer, Mae F. Meurer, Anna M. Hopkins, Grace M. Richards and Roy S. Young, on July 17, 1937, made a partnership agreement for the stated purpose of engaging, *430 commencing July 19, 1937, in the business of manufacturing steel barrels at 105 Avenue L, Newark, New Jersey, under the firm name of Meurer Steel Barrel Company. This agreement provided, inter alia, as follows: 10. Such of the partners or other officers of the corporation as are not taken over by the ultimate purchaser of said business from the copartnership shall be entitled to draw from the partnership salary at the rate heretofore paid, until the close of the current calendar year. To the five partners the petitioner transferred all the assets comprising its steel barrel manufacturing business, including goodwill and the right to use its name, of the net value of $500,000. The members of the partnership assumed all of petitioner's liabilities incurred prior to July 17, 1937, excepting (a) capital, surplus and profits; (b) the obligations to Manufacturers Trust Company; (c) federal and state capital stock, franchise and income taxes, and (d) unpaid dividends. Jones and Battershall on the same day agreed to sell, and the five copartners agreed to buy, their 2,000 common shares. It was recited that Jones had assigned his option to Rheem Manufacturing Company and that the copartners *431 had been informed of a "possible opportunity" to dispose of the assets received by petitioner's shareholders. On the same date, Jones assigned his option to Rheem Manufacturing Company. Rheem Manufacturing Company, a California corporation, was a competitor of petitioner and had its principal office in Richmond, California. It desired to secure a plant in the East. The sales committee extended the option to July 26, 1937. On July 17, 1937, certificates of outstanding shares (other than those of W. W. Share) were cancelled and redeemed to the extent of the "first liquidating dividend". On the same date, Stern wrote the Secretary of State of New Jersey that the petitioner had transferred its plant in New Jersey "to its stockholders, as the first step in the process of dissolution and liquidation" and "contemplates presently withdrawing its right to do business in the State of New Jersey." Subsequent to July 9 and until July 22, 1937, Stern and the attorneys for Jones and the purchaser negotiated for a contract to amplify the terms of purchase set forth in the option. Stern informed the attorneys of the plan of the liquidation of the petitioner and formation of the partnership and *432 transfer to it of the steel barrel manufacturing business of petitioner. To the purchaser it was immaterial from whom the assets were purchased; but assets and not stock were what it wished to buy. Its attorney demanded proof that the copartners owned the assets, and this was furnished to him. The contract was signed by Rheem Manufacturing Company on July 17, 1937, and by the copartners on July 22, 1937. In it, the purchaser gave notice of its election to exercise Jones' option. The down payment of $50,000 was made by check dated July 20, 1937, payable to the copartners doing business as Meurer Steel Barrel Company. The transfer of the assets was to be made on August 2, 1937, and all adjustments computed as of the close of business on July 30, 1937. On August 6, 1937, the copartners transferred all the assets comprising the steel barrel manufacturing business to Rheem Manufacturing Company. The steel barrel manufacturing business was conducted by the partnership from July 17 to July 30, 1937, under the direction of Stern, Andrew Meurer and Roy S. Young. The total adjusted price under the contract of sale between the Rheem Manufacturing Company and the copartners was $646,628.74, which *433 was paid as follows: Down payment
$ 50,000.00
Payment of New Jersey Title Guar-
antee & Trust Co
1,528.74
Certified check delivered at closing
316,575.00
Purchaser's non-negotiable promis-
sory note payable December 10,
1937, without interest, secured by
a purchase money mortgage (paid
on or about December 2, 1937)
234,500.00
Purchaser's non-negotiable promis-
sory note payable December 10,
1937, without interest, secured by
a purchase money mortgage
44,025.00
$646,628.74
Certificate of dissolution of petitioner was issued by the Secretary of State of New York, October 24, 1938. Liquidation of the corporation continued during 1938 and 1939, and payments were made to shareholders accordingly. In March, 1938, the judgment entered in the suit before the Court of Claims against the United States in the amount of $42,224.32 was paid and the liquidating trustees received $31,818.24. 3. During 1937, the petitioner paid legal fees of $8,000 and accounting fees of $1,500 in connection with its liquidation and dissolution. 4 (a). In 1937, the petitioner sustained a capital loss of $79,239.04 in the sale of securities. This loss was reported in petitioner's 1937 return, but *434 the amount deducted was $2,000. 4 (b). The adjusted purchase price of the barrel business and assets included $176,100 as cost of inventory. In the partnership books of account, value of the inventory as of July 17, 1937, was set up at $139,174.55. Its inventory as of July 30, 1937, was $176,100. In the contract of sale, the purchaser agreed to buy inventories at actual cost or at current market price, whichever was lower. In computing gain or loss to petitioner on the sale, the Commissioner included in the cost basis inventories of $139,174.55. 4 (c). On the partnership books the net value of buildings, machinery and equipment as of July 17, 1937, was $188,300.24. In the partnership return, the cost of such items at the time of sale was stated as $189,050.65. The Commissioner, in the basis of assets sold, used the figure of $188,300.24. 4 (d). An additional payment of $1,628.28 was made by the purchaser on account of advances made by the copartners subsequent to July 30, 1937, and before closing, minus refunds to purchaser on account of insurance policies not taken over by purchaser. The items included in this amount were not charged to expense and were not deducted in the partnership *435 return. The respondent added this amount to proceeds of sale in computing the gain realized by petitioner on the sale of its business assets. 4 (e). Petitioner was organized December 29, 1913, and on December 31, 1913, it acquired from Brooklyn Range Boiler Company all of its assets, including the Young patent covering a steel barrel, in exchange for all its shares consisting of $150,000 preferred and $200,000 common. The assets so acquired were set up on its books at a value of $350,000, of which $78,475.16 was allocated to tangible as sets and $271,524.84 to "Patent Right and Good Will". The petitioner thereupon engaged in the manufacture of steel barrels. The Young patent expired in 1925. In 1914 to 1917, inclusive, the amount of $271,524.84 was charged to Surplus, and the account of Patent Right and Good Will was eliminated. The account was restored in 1919 by a credit of $271,524.84 to the surplus account. In June, 1921, petitioner, in a protest filed with the Commissioner of Internal Revenue covering 1916 and 1917, claimed that the amount of $271,524.84 designated on the Balance Sheet as "Patent and Good Will" represented the value of the patent and did not include any goodwill *436 "as the new firm did not continue in the same line as the old concern", and that it was entitled to a depreciation allowance of $24,664.08. For 1916, the claim of petitioner for depreciation was allowed based upon the January 1, 1914, cost of patent of $271,524.84, and a life of eleven years. 5. On August 10, 1937, the administrator of W. W. Share's estate sold its shares and its rights to liquidating dividends to Mae F. Meurer. On August 11, 1937, the first cash distribution of $50,000 was made to shareholders on the basis of $10 a preferred share, as follows: Andrew Meurer
Derived from: K. M.
200
$ 2,000
A. M.
15
150
A. M. Jr
200
665
2,000
L. M. M.
250
2,500
$ 6,650
Mae F. Meurer
Derived from: M. F. M.
1,700
$17,000
W. S.
200
2,000
M. C. M.
35
1,935
350
$19,350
Grace M. Richards
1,000
$10,000
Anna M. Hopkins
1,000
10,000
Roy S. Young: Derived from: R. S. Y.
225
2,250
M. Y. T.
175
400
1,750
5,000
$ 4,000
50,000 A distribution of $125,000 was made on August 24, 1937, on the basis of $25 a preferred share. Distributions of $40,000 and $135,000, respectively, of $8 and $27 a preferred share, were made on *437 October 22, 1937, and December 11, 1937. On December 11, 1937, and December 31, 1937, distributions were made of $135,000 and $10,000, respectively, on the basis of $27 and $2 a common share. Another distribution of $5,000 on the basis of $1 a common share was made on May 17, 1938. In 1920, a stock dividend of $350,000 in preferred and $300,000 common was issued and charged to surplus. In 1935, the par value of the common stock was reduced from $100 a share to $1 a share and a credit of $495,000 was made to surplus. Thereafter, the outstanding stock consisted of 5,000 common, $1 declared value, and 5,000 preferred, $100 par. After eliminating items representing distribution of stock dividends, reduction of par value of common stock, and charges and credits setting up goodwill and patents or writing them off, reserves, and other items not properly chargeable against earned surplus, the balance of earned surplus as of the end of 1937 as shown by the books of account of petitioner, was $339,231.98, before the deduction of cash dividend of $17,500, or $3.50 a preferred share, declared at the meeting held July 15, 1937, and the "first liquidating" dividend. 6. The petitioner filed its *438 income and excess-profits tax return for 1937 on or before March 15, 1938. The gross income shown thereon was $137,544.31. On November 23, 1938, Stern, as attorney for the liquidating board of petitioner, wrote to the Collector at Newark, New Jersey, in part, as follows: In view of the fact that the above corporation retired from business July 17, 1937, after adopting, on July 15, 1937, a Complete Plan for Liquidation and Dissolution, we wonder whether it would not be possible to expedite the examination of the 1937 Return of such corporation, and permit final distribution now to be made within the period contemplated by the plan. * * *
On November 28, 1938, the Collector acknowledged receipt of the letter of November 23, "requesting an early audit of the 1937 income tax return" of the corporation, and advised that the letter had been forwarded to the Bureau in Washington with a request that final audit of this return be made at the earliest possible date. On December 8, 1938, the Commissioner wrote to Stern acknowledging that "a request was made for early determination of the income tax liability for the year 1937 of the Meurer Steel Barrel Company, Inc.," and stating that satisfactory *439 evidence of Stern's authority to make such a request had not been submitted. By letter of December 9, 1938, Stern advised the Commissioner that he was assistant secretary of the corporation and that, accordingly, no power of attorney was required. On December 23, 1938, the Commissioner advised the corporation that "a closing of the return will be accomplished at the earliest practicable date." Thereafter, an Internal Revenue Agent made an audit of the corporation's 1937 tax return, and the results of such examination were set forth in his report of March 30, 1939, which showed an additional income tax liability of $1,651.84 for 1937 due to the disallowance of deductions for dissolution expenses, excessive depreciation, capital stock tax, and unemployment tax. The corporation, on June 1, 1939, paid that amount, plus interest. A notice of deficiency was sent on March 10, 1941, based on a determination that petitioner had realized a profit in 1937 of $261,446.69 upon sale of its assets to Rheem Manufacturing Company. Opinion STERNHAGEN, Judge: 1. The petitioner says that the deficiency was arbitrarily determined and therefore must be set aside. The charge of arbitrariness is based *440 upon alleged errors which are said to indicate lack of care. There is, however, no foundation for a holding that, whether correct or not, the determination was arbitrary. 2. The principal question in this proceeding is whether the sale of the assets of the manufacturing business which were bought by the Rheem corporation must be attributed to petitioner, as the Commissioner has determined, or to the partnership composed of petitioner's former shareholders. If the corporation be regarded as having sold its assets at a profit, it was taxable upon the profit; if it be regarded as having distributed its assets in liquidation to its shareholders, it realized no profit and is not taxable. In August, 1936, Jones wanted an option on the shares. When the option was executed in January, 1937 it recited the optionee's desire to obtain the assets and goodwill, either directly or indirectly. It was never suggested that anyone was interested in buying the shares for their own sake, as would, for example, a dealer in securities. The possible purchaser contemplated was a competitor of petitioner. The price was fixed with reference to the manufacturing assets exclusive of the securities owned as *441 investments by petitioner and of the claim against the United States in litigation. In July, 1937, when the option was soon to expire, and the optionee wanted to acquire the plant and business instead of the shares, events were shaped to accomplish that end. It was arranged to distribute the manufacturing plant and the barrel business and assets to the shareholders, who formed a partnership and took the business in block. The partnership, in July, sold the assets and business to the assignees of the Jones option, and the purchase price was paid to the partnership. The petitioner then proceeded with dissolution and liquidation of its remaining assets. The petitioner with great care adopted the method of distributing its assets and its counsel was meticulous in seeing that this was adhered to in detail. We, nevertheless, must hold that the substance of the transaction from beginning to end was a sale by petitioner by a devious and roundabout method (cf. , the result of which was a realization of profit, upon which it is taxable. Throughout the whole proceeding, the pervading intention was to effect a transfer *442 of the assets, and each act was a step to that end. The initial option on the shares was given with a recital of the optionee's desire to acquire the assets and goodwill of petitioner's business. This was the end that remained in view until it was achieved. Every act was fitted to that end and no detail was inconsistent with it. The short period in July, 1937, when the assets were legally owned by the shareholders and the partnership, was but an interim in carrying out the plan. We can not, on the evidence, believe that there was any intent that the partnership would retain the assets and operate the business. It was but a straw man to give the legal appearance of ownership to a transitory step in the transfer. It was a "technically elegant arrangement" which is less than real and substantial. . This is not exactly like any of the arrangements which have been considered in prior cases; but the difference is in the ingenuity and detail with which it was devised. The question is essentially the same, i.e., whether what was done was a single substantial transfer for one corporation to the other, or was a number of *443 substantial acts, each separate from the other and requiring separate recognition. This is a question of fact which the trier of each case must determine from the evidence. In determining the fact, the circumstances and setting must be considered, and not only the bare formal acts. The circumstances are what give character to the transaction. Since in truth it is clear that all that was done was in unified integrated plan, there is no warrant for treating each legal step as if it stood alone and unrelated to the rest. ; , certiorari denied, ; rehearing denied, . No doubt there are cases in which, in fact, the several acts, although consecutive, are not related even though they appear to be. Cf. . This is not such a case. Every step was palpably part of the plan to transfer the assets to the ultimate buyer, even though his identity was for a while unknown. The dealing was not for the purpose *444 of transferring shares of stock, and was not carried out in that form. Even if it had been, it would only have been a means of transferring the barrel business. Any method which had not resulted ultimately in the transfer of the assets and business would have failed of its purpose, and could not be recognized by the Commissioner or the court any more than it would have been recognized by the parties to the arrangement. Many cases are cited and we have read many more. They are listed in the footnote. [1] No useful purpose would be served to discuss them. We sustain the Commissioner's determination that the petitioner sold the assets and realized the profit. *445 3. The $9,500 legal and accounting expenses of dissolution are deductible within the rule of . 4(a). The petitioner in the taxable year sustained a loss of $79,239.04 in the sale of securities, as both sides agree. In its return, petitioner set forth the transaction, some showing gains and others losses; resulting in a net loss of $79,360.14, [2] and since it was a capital loss, took a deduction of $2,000. The gain on the sale of the barrel business assets was not included on the return. The purchasers of the securities were not shown; but until respondent's brief was filed, no one mentioned that as an omission, as it would have been if Section 24 (a) (6), [3] Revenue Act of 1936, were thought to be a matter for consideration. Indeed, by allowing the $2,000 deduction, as the Commissioner did, he gave reason for a belief that, having made the proper investigation, there was no reason to apply Section 24 (a) (6). When, however, the gain of $261,446.69 on the sale of the barrel business assets was included by respondent in petitioner's income, the entire loss of $79,239.04 became a factor to reduce the capital *446 gain; and this was pleaded by petitioner. At the trial, respondent's counsel stipulated that a capital loss of $79,239.04 had been sustained in the sale of securities. Petitioner's counsel understood this statement to relieve him of any further proof on the subject. In view of the fact that respondent had treated the loss as a capital loss and had himself recognized it *447 as deductible, albeit limited to $2,000, petitioner's understanding was a reasonable interpretation of respondent's position. Respondent now, in his brief, for the first time suggests that petitioner may not be allowed a deduction or offset of the $79,239.04 loss against the $261,446.69 gain because it has not shown that the securities were sold to persons not related to it as described in Section 24 (a) (6). In this, respondent is unfair. He is not entitled to rely upon the failure of proof thus induced as ground for nonrecognition of the $79,239.04 capital loss. He made no determination that because of Section 24 (a) (6), or any facts covered by that section, the loss was not deductible, but on the contrary recognized the loss as deductible within the $2,000 limit. Thus, by clear implication, he determined that Section 24 (a) (6) was not in question. If, when the case came to trial, he thought this was incorrect, it required proper pleading on his part and timely notice to the petitioner. Cf. ; . On the record, it is held that in the *448 taxable year petitioner sustained a capital loss of $79,239.04 in the sale of securities and that the entire amount is a factor in the determination of capital net gain. 4(b). The respondent, in his brief, concedes that "petitioner is entitled to this addition [$36,925.45 on account of additions to inventory], the inventory having been sold on a basis of cost or market, whichever was less, under the terms of the main contract." This amount will, therefore, serve to reduce the gain from sale and will be taken into account in redetermining the deficiency. 4(c). The petitioner complains of the Commissioner's use of the book value of $188,300.24 instead of $189,050.65, as used by the partnership on its return. The evidence is no more than this, and it is inadequate as support for a decision that the cost of the assets sold should be $750.41 higher than adopted in the deficiency notice. 4(d). During the interim period before the closing with Rheem Company, $1,628.28 was paid by the partnership in the course of the business and this amount was repaid by the purchaser. The Commissioner treats this as part of petitioner's gain. This, we think, is error. The amount had not been treated *449 by petitioner or the partnership as deductible expenses and was properly an item to be added to cost. Its recovery by way of reimbursement from the purchaser was therefore not a gain, and should be eliminated from taxable income. 4(e). The petitioner contends that the basis for gain on sale of assets must be increased by $271,524.84, and the gain thus correspondingly reduced. It is said that the assets sold included goodwill and that the cost of the goodwill was the $271,524.84 alleged to have been paid for goodwill acquired from the Brooklyn Range Boiler Company in December, 1913. As shown by the findings, the $271,524.84 was the amount attributed to "patents and goodwill" without segregation, the patent being the Young patent on the steel barrel. There are several reasons why this claim of added cost cannot be sustained. There is no direct evidence as to the part, if any, of the $271,524.84 which could be attributed to goodwill. So much as was properly attributable to the patent must certainly be regarded as having disappeared with the life of the patent long before the sale of the business of 1937. If any remaining part of the $271,524.84 was, in fact, paid for goodwill in 1913, *450 the amount would be a subject of proof. No such proof is in the evidence, and petitioner asks a judicial inference that goodwill existed in 1913, that its value is determinable by a mathematical capitalization of earnings and continued expansion of the business. We are not at liberty to make the assumption necessary to support such an inference for the purpose of assigning a part of the amount of $271,524.84 to goodwill and regarding this as the cost of some of the assets included in the 1937 sale. So far as this record establishes, the Commissioner was correct in not including any part of the $271,524.84 in the basis as if it represented cost of either patents or goodwill. 5. The Commissioner allowed a dividends paid credit of only $17,500 for the cash dividend payable in December, 1937, on preferred shares. No credit has been allowed in respect of the other distributions made in liquidation. The reason for the disallowance is said to be that the liquidating distributions were preferential and therefore deprived of credit by reason of Section 27 (g), Revenue Act of 1936. [4] The distribution was made equally among all of the shares of each class, i.e., the $350,000 to the preferred *451 at the uniform rate of $70 a share; the next $150,000 to the common at the uniform rate of $30 a share. In this we can see no preference. The respondent argues that the distribution was in effect preferential to the common because it was at variance with the charter preference to which the preferred was entitled. This is based on a theory that shares of one class (common) received a preference as compared with shares of another class (preferred). There is nothing in the language of the section to support such a view. This was not the final distribution. To bolster his contention under Section 27 (g) of the Revenue Act of 1936, which is the effective section, the respondent invokes Section 27 (h), Revenue Act of 1938, on the ground that the latter act is said in the House Committee Report to be a clarification of the earlier act. We think this is to misread the plain intendment *452 of the House Committee Report. Under Section 27 (f), 1936 Act, a corporation is entitled to a dividends paid credit in the case of a liquidation distribution "of the part of such distribution which is properly chargeable to earnings or profits accumulated after February 28, 1913. [5] It is not entitled to a credit of any part of such distribution which is chargeable to capital. [6] To ascertain the amount of the credit, it is therefore necessary to determine what portion of the distribution in liquidation in the amount of $495,000 made in 1937 is properly chargeable to the earnings and profits. The earned surplus remaining at the end of 1937 after the distribution of cash dividend of $17,500 was $321,731.98. This amount should be reduced by the amount of the deficiency in taxes for 1937 redetermined in accordance herewith. . The respondent determined a profit on the sale of the steel barrel business of $261,446.69. This amount must be reduced by the amount of $36,925.45 (issue 4(b)) and $1,628.28 (issue 4(d)), the profit realized by the petitioner so reduced being $222,892.96. The capital was *453 $350,000. The cost basis used by the respondent in his computation of the gain realized by petitioner on the sale of the steel barrel business was $381,735.33. To this amount must be added the amount of $36,925.45 (issue 4(b)), making the cost basis $418,660.78. All the factors required for the application of the formula approved in , for the computation of the amount of a distribution in liquidation properly chargeable to earnings or profits and the amount thereof chargeable to capital are set forth above, excepting the amount of the deficiency in taxes for 1937. Computation of the amount of the credit to which petitioner is entitled under Section 27 (f) will be made accordingly under Rule 50. *454 6. Petitioner contends that the determination is barred by the statute of limitations. Section 275, Revenue Act of 1936. The return was filed March 15, 1938, after the plan for liquidation and dissolution had been adopted in July, 1937. The certificate of dissolution of the Secretary of State of New York was issued October 24, 1938. Stern, assistant secretary of the corporation, wrote the Collector at Newark, New Jersey, on November 23, 1938, requesting that the examination of the return be expedited. The deficiency was determined and notice sent March 10, 1941, which was less than three years after the return was filed and two years and four months after Stern's letter. The Commissioner meets this contention on two grounds: (1) that the eighteen month period of Section 275 (b) is not available to petitioner because it has not complied strictly with its requirements, and (2), that, since petitioner omitted from the gross income shown on its return an amount more than 25 per cent thereof, the period of limitation is five years (Section 275 (c)), and the date of March 10, 1941, was well within it. Since the profit was properly determined to be attributable to petitioner in 1937, *455 and the amount omitted from the gross income was more than 25 per cent of the gross income shown on the return, the period available to the Commissioner is five years, as provided in Section 275 (c). This subsection has been held ( to expand the period which might be otherwise limited by Section 275 (b). It is not necessary, therefore, to consider petitioner's point that Stern's letter of November 23, 1938, met the requirements of Section 275 (b); for even if it did (cf. ) the limitation of that subsection would be ineffective in view of the applicability of Section 275 (c). The determination was not barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. ;; ; ; ; , certiorari denied, ; ; ;↩, certiorari denied, ; ; ; ; ; ; ; .
2. The figure shown on the return was inaccurate. ↩
3. SEC. 24. ITEMS NOT DEDUCTIBLE (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - * * * * *
(6) Loss from sales or exchanges of property, directly or indirectly, (A) between members of a family, of (B) except in the case of distribution in liquidation, between an individual and a corporation in which such individual owns, directly or indirectly, more than 50 per centum in value of the outstanding stock. For the purpose of this paragraph - (C) an individual shall be considered as owning the stock owned, directly or indirectly, by his family; and (D) the family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.↩
4. SEC. 27. CORPORATION CREDIT FOR DIVIDENDS PAID (g) Preferential Dividends. - ↩ No dividends paid credit shall be allowed with respect to any distribution unless the distribution is pro rata, equal in amount, and with no preference to any share of stock as compared with other shares of the same class.
5. ; ; , dismissed C.C.A. 9, June 29, 1942; , dismissed, (C.C.A. 9); . ↩
6. (on review C.C.A. 6). (Note: BTA decision was affirmed by CCA-6, .↩